UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  MAHMOUD S. RAHIM and  .       Docket No. 10-57577
        RAYA H. ABDULHUSSAIN, .
                             .        Detroit, Michigan
               Debtors.      .        November 22, 2010
. . . . . . . . . . . . . . .         10:06 a.m.


HEARING RE. CREDITOR PACIFICA LOAN FOUR, LLC'S, MOTION TO
DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. 707(A);
CREDITOR DAVID R. BARTLEY, SR.'S, MOTION TO DISMISS PURSUANT
TO 11 U.S.C. 707(A)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:       Gold, Lange & Majoros, PC
                       By:  JASON P. SMALARZ
                       24901 Northwestern Highway, Suite 444
                       Southfield, MI  48075
                       (248) 350-8220


For Pacifica Loan      Foley & Lardner, LLP
Four, LLC:             By:  SCOTT T. SEABOLT
                            ADAM J. WIENNER
                       One Detroit Center
                       500 Woodward Avenue, Suite 2700
                       Detroit, MI  48226
                       (313) 234-7162


For Creditor           Richard E. Segal & Associates, PC
David R. Bartley,      By:  TODD W. GRANT
Sr.:                   6230 Orchard Lake Road, Suite 294
                       West Bloomfield, MI  48322
                       (248) 855-4880


For the Chapter 7      Steinberg, Shapiro & Clark
Trustee Mark           By:  TRACY M. CLARK
Shapiro:               25925 Telegraph, Suite 203
                       Southfield, MI  48033
                       (248) 352-4700

Court Recorder:      Letrice Calloway
United States Bankruptcy Court
211 West Fort Street
21st Floor
Detroit, MI  48226-3211
(313) 234-0068

Transcribed By:      Lois Garrett
1290 West Barnes Road
Leslie, Michigan  49251
(517) 676-5092

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  Case Number 10-57577, Mahmoud Rahim.

2    MR. SEABOLT:  Good morning, your Honor.  Scott

3  Seabolt appearing on behalf of Creditor Pacifica Loan Four,

4  LLC.

5    MR. GRANT:  And Todd Grant appearing on behalf of

6  Creditor David Bartley and his real estate company.  We've

7  talked.  Pacifica will be presenting their argument first,

8  your Honor.

9    THE COURT:  Okay.

10    MR. SMALARZ:  Good morning, your Honor.  Jason

11  Smalarz appearing on behalf of Dr. Rahim and Dr.

12  Abdulhussain.

13    THE COURT:  Are they here?

14    MR. SMALARZ:  No, sir.

15    MR. SEABOLT:  Your Honor, this is --

16    THE COURT:  How quickly can they be here?

17    MR. SMALARZ:  We could give them a call, your Honor,

18  get them here maybe within an hour.

19    THE COURT:  All right.  I'll let you know.

20    MR. SEABOLT:  Your Honor, this is Pacifica's motion

21  to dismiss the bankruptcy filing of the debtors here based on

22  the concept of bad faith.  And, your Honor, we've set forth

23  in our pleadings the various factors -- and there are 14 of

24  them -- that are relevant to the determination of whether a

25  dismissal for a bad faith filing are appropriate.  I won't

1   repeat those here, your Honor.  I think they're adequately

2   set forth in our brief.  If it pleases the Court, what I'd

3   like to do is talk about three specific issues here today,

4   and the first issue deals with a statement made in the

5   response regarding efforts made by the debtors -- alleged

6   efforts made by the debtors to try to resolve the $3.8

7   million debt owed to my client, Pacifica.  And in their brief

8   on a number of occasions they make statements to the effect

9   that the debtors, both personally and through counsel in

10  Florida and in Michigan -- and, of course, "in Michigan"

11  implicates my office -- made substantial efforts to negotiate

12  a settlement and/or payment plan with both Colonial Bank and

13  Pacifica.  Neither Colonial Bank nor Pacifica was willing to

14  work out a settlement with the debtors.  Colonial Bank is the

15  predecessor, if you will, on this particular debt.  Your

16  Honor, that statement is categorically false.  There were no

17  efforts made as it relates to my client, Pacifica, to try to

18  resolve this debt, to make any payments on this debt, or to

19  otherwise try to negotiate any kind of payment plan.

20       The judgment of Pacifica was secured in February of

21  this year, your Honor.  After securing this judgment, my

22  client personally made attempts to contact the debtors to try

23  to discuss what could be done with this debt, and those calls

24  went unreturned.  After we domesticated the judgment here in

25  Michigan, which was effective at the end of March of this

1  year, I and my colleague, Mr. Wienner, who's here with me

2  today, had discussions with the non-bankruptcy counsel for

3  the debtors, and we invited them to make any kind of proposal

4  they thought appropriate here towards a payment plan and for

5  some sort of payment on this debt.  No proposal was ever

6  forthcoming.  And so this statement -- and it's made at least

7  four different times in the brief -- that they made efforts

8  with my client and, in particular, with my client in Michigan

9  where I was involved in representing my client is simply not

10  true.  And I think that's important not only because it's one

11  of the specific 14 factors but also because the fact that the

12  debtors would go so far as to misrepresent what had been done

13  in connection with this debt as it relates to my client I

14  think speaks to their lack of good faith.

15       The second point I'd like to discuss, your Honor,

16  are the disclosure statements here that were made, and the

17  disclosure statements are unquestionably false.  And we know

18  that for a couple of reasons, and they're false in a couple

19  of key respects.  First, if we assume that the disclosures

20  are accurate, the debtors only have $20 a month free and

21  clear after they've paid all of their debts that are due on a

22  monthly basis, but we know that in Schedule J they did not

23  disclose a $1,000 monthly payment that they make to their

24  niece to try to support her.  If they only have $20 a month,

25  that thousand dollar payment simply wouldn't be possible.  We

1  also know that in March of 2010, just two months before the

2  bankruptcy, they made a $30,000 down-payment on a BMW.  And

3  for the record, your Honor, while the debtors claim to have

4  downgraded when their third automobile after their first two

5  Mercedes was only a BMW, where I'm from, your Honor, a BMW is

6  a luxury automobile.  And a $30,000 down-payment in March of

7  2010 simply is not consistent with this notion that they have

8  only $20 a month free and clear after the payment of their

9  debts.

10        We also know, your Honor, if we look at their March

11  2010 bank statement, which is attached as an exhibit to our

12  brief, that in March they made $4,700 of cash withdrawals,

13  ATM withdrawals, in denominations of 700 to $800 a pop,

14  again, not consistent with the notion that they have only

15  $20.

16        We also know, your Honor, that in March in what

17  we've disclosed in our brief, they had $11,000, a 5,000 and

18  $6,000 wire payment that we were told was to pay down a line

19  of credit, but that's not a scheduled payment.  That was over

20  and above what their scheduled payments were, $11,000.

21        And we also know, your Honor -- I looked this

22  morning, and actually later in March -- and I can present

23  this to the Court if you'd like -- later in March, March 24,

24  they made another $15,000 wire transfer, so now we're up to

25  $26,000 of wire transfers.  We've got $4,700 of cash

1 | withdrawals, and we've got a $30,000 down-payment. That's
2 | roughly $60,000 in March alone of unscheduled cash
3 | transactions by these debtors, and yet they claim to have
4 | only $20 free and clear.
5 | I would submit, your Honor, that those facts, which
6 | are indisputable, belie any notion that the schedules
7 | attached by these debtors are in any way accurate or in any
8 | way honest and forthcoming.
9 | The third point I'd like to make, your Honor, goes
10 | to the general notion of what these debtors are paying for
11 | and whether or not they've engaged in the belt-tightening
12 | that is expected of a debtor in these kinds of proceedings,
13 | and, again, the facts are indisputable, and they're somewhat
14 | shocking. We have a debtor here who owns three luxury homes
15 | and pays on a monthly basis $20,000 in mortgage payments, and
16 | yet we know, based on what's been filed to date, that this
17 | debtor intends to reaffirm every one of those debts.
18 | One of those homes is a vacation home down in
19 | Florida, and on that home this debtor, according to their
20 | schedule, pays $1,800 per month in association dues. This is
21 | over and above the $20,000 mortgage and line of credit
22 | payments that are made on these homes, $1,800 in association
23 | dues monthly, monthly, $20,000 annually in association dues.
24 | We also know that this debtor -- and this starts to
25 | get into somewhat smaller items, but, nevertheless, these are

1  monthly items, and these add up to significant cash, and

2  there's no evidence and no indication that they intend to do

3  anything to tighten their belts here.  $1,500 a month for

4  food.  And the debtor told us in his deposition -- and we've

5  cited this in our brief -- that they go out to dinner a

6  couple of times a week, and going out to dinner can get very

7  expensive these days.  Well, unfortunately, expensive dinners

8  are not something that debtors in bankruptcy ought to be

9  allowed to do, particularly when they have creditors lined up

10  behind them who are owed legitimate debts.

11        $320 a month for recreation, club, and

12  entertainment; $450 a month in charitable contributions.  And

13  also on this notion of charitable contributions, your Honor,

14  I mentioned the niece, a thousand dollars a month that they

15  give to the niece.  And the response we get from the debtors

16  is, well, that's not really an obligation that's owing.

17  That's more like charity.  Well, I don't know that I

18  particularly care.  I suppose the fact that there's no

19  obligation in a sense makes it worse because this is a

20  thousand dollars a month leaving the estate that could be set

21  aside to payment of creditors.  I don't think that's an

22  excuse.  I don't think it's a justification in any way,

23  shape, or form.

24        We also have care of other family members that adds

25  up to well over $500 a month.  And, again, it might be

1  admirable, your Honor, it might be very admirable to pay for

2  extended family members, but it's not an obligation.  And

3  that kind of behavior is not consistent with the obligation

4  that's owed to the creditors in the context of a bankruptcy

5  proceeding.  And we have other payments like that indicated

6  throughout these.  They simply haven't engaged in any kind of

7  belt-tightening measures.  The fact of the matter is, your

8  Honor, if you take all of these payments -- we've got the

9  $60,000 of cash that went out the door in March even though

10  they only have $20 a month.  We have literally thousands of

11  dollars being paid that could be eliminated in cash flow

12  created.  We're talking about a six figure amount that could

13  be created based on the disclosures that are made here to the

14  payment of these creditors, and when you couple that with the

15  fact that no efforts were made to negotiate with my client in

16  advance of this bankruptcy filing -- and I do think that's

17  critical, your Honor -- I don't think there's really any

18  question but that this particular bankruptcy was not filed in

19  good faith.  It was filed by a debtor who wishes to maintain

20  what is by any measure an extravagant and lavish lifestyle

21  well beyond the means of a person with these sorts of debts

22  hanging over their head.  Thank you, your Honor.

23       MR. GRANT:  Your Honor, for the sake of efficiency,

24  would you prefer to hear from me for David Bartley because it

25  is a parallel motion to Pacifica before hearing from --

1       THE COURT:  Well, for the sake of efficiency, I am

2   interested in hearing whatever additional argument you have

3   to make.

4       MR. GRANT:  Yes, your Honor.  I will be very brief.

5   Todd Grant for Mr. Bartley.  I think this falls into a

6   pattern your Honor I'm sure has seen repeatedly on years on

7   the bench where somebody has enormous debts but also an

8   enormous lifestyle.  And your Honor is probably aware -- and

9   I happened to educate myself again this weekend in getting

10  ready for this morning's hearing -- that the average annual

11  household income in Michigan is 45,000.  If you make over a

12  third of a million dollars a year, that puts you in the top

13  one percent, and I'd just like to emphasize what my brother

14  counsel said, that these people are clearly in the top one

15  percent.  And the other thing he didn't mention, which is

16  interesting, if they were getting W-2s, it would be a

17  different matter, but because they own Associated Physicians

18  of Southeast Michigan, P.C., they're able to play with what

19  their income is.  Two of the Mercedes, for example, are

20  actually leased to their physician practice, but they have

21  free access to them all the time, so what is business debt

22  and what is personal debt is to a good extent under their

23  control.  And it would be pretty hard, I think, to explain to

24  the person on the street where as I saw a wonderful ad one

25  day -- I think it's on I-94 -- advertising a bankrupt

1   counsel.  It says, "Dump your debts.  Keep your stuff."  How

2   could it be that these people could emerge from a Chapter 7

3   bankruptcy with three homes, three Mercedes, and their kids

4   at Detroit County Day School?  And I think your Honor can

5   know that somehow if they were forced -- the children, for

6   example, to go to Bloomfield Hills Public Schools, I think

7   your Honor could take judicial notice that wouldn't exactly

8   be disadvantageous.

9          I think a shrink ray needs to be taken to their

10  lifestyle.  My client, David Bartley, is suffering.  I think

11  concomitant suffering on their part would also be

12  appropriate.  Thank you.

13         MR. SMALARZ:  Thank you, your Honor.  I'd first like

14  to address some of these alleged misrepresentations that were

15  mentioned by brother counsel.  The fact -- there were

16  substantial negotiations between the debtors and the

17  predecessor to Pacifica, Colonial Bank.  There's no question

18  about that.  There was an attorney in Florida who had worked

19  with Colonial Bank to attempt to settle the debt.  And by way

20  of background, your Honor, the debt that's owed to Pacifica

21  is a deficiency judgment for some commercial property that

22  was foreclosed upon by Colonial Bank down in Florida a few

23  years ago, so there was substantial attempts to negotiate

24  some sort of settlement with Colonial Bank prior to that debt

25  being transferred from the bank to Pacifica.

1    In addition, an attorney by the name of Garry
2 Greenberg, who works -- has worked with the debtors for a
3 number of years, had some at least preliminary discussions
4 with Pacifica.  I cannot speak as to the extent of those
5 discussions as we were not -- my office was not a party to
6 that, per se, so I can say there was some preliminary
7 discussion, so the fact that -- the allegation that that is a
8 blatant lie, quite frankly, is not correct, your Honor, in
9 addition to the allegation that a thousand dollars a month is
10 being paid to the niece and that wasn't disclosed.  That's
11 simply not true.  It's stated right in the statement of
12 financial affairs that the debtors do provide some assistance
13 to relatives who are in need of dire -- or in dire need of
14 assistance, and that was disclosed in the statement of
15 financial affairs.
16    THE COURT:  But not in Schedule J?
17    MR. SMALARZ:  No, your Honor, because those are not
18 obligations.  Schedule J basically consists of, you know,
19 living expenses and expenses that the debtors need.  These
20 are not living expenses of the debtors.
21    THE COURT:  Well, let me ask you this question.
22    MR. SMALARZ:  Yes.
23    THE COURT:  Apart from the money given to this
24 relative not disclosed on Schedule J, do the debtors do
25 anything else with their money that's not disclosed in

1  Schedule J?

2      MR. SMALARZ:  To the best of my knowledge, no, your

3  Honor.  Additionally, the --

4      THE COURT:  How much do they send to relatives?

5      MR. SMALARZ:  I believe what is stated on the

6  statement of financial affairs is correct.

7      THE COURT:  Please answer my question.

8      MR. SMALARZ:  Well, your Honor, I believe it's

9  approximately a thousand dollars a month to the debtor's

10  niece, and I believe it's roughly $500 a month, give or take,

11  to the co-debtor's mother.

12      THE COURT:  Where does that come from given that

13  Schedule I -- or excuse me -- Schedule J shows monthly net

14  income of only $20?

15      MR. SMALARZ:  Your Honor, the debtors do not have

16  traditional income in the sense that they do not receive

17  paychecks.  They are not W-2 employees.  They're not even

18  1099 employees.  Like many small business owners, a number of

19  their expenses are paid for out of the business, and the

20  debtors keep track of these expenses through their

21  accountants with accounts -- or basically a ledger entry on

22  the business' balance sheet, accounts receivable, accounts

23  payable, that sort of thing, so it's my belief --

24      THE COURT:  What other personal expenses does the

25  business pay other than this relative?

1          MR. SMALARZ:  Well, your Honor, without looking at a

2     ledger and having one in front of me or speaking with the

3     accountant, I can't speak to exactly what other expenses

4     specifically there are.

5          THE COURT:  How much are these Mercedes?

6          MR. SMALARZ:  I do not have Schedule J in front of

7     me, your Honor, but I do --

8          THE COURT:  Is it on Schedule J?

9          MR. SMALARZ:  Yes, it's on Schedule J.

10         THE COURT:  I don't see it.  Can you help me?  I'll

11    put it up on the wall.

12         MR. SMALARZ:  Yes.

13         THE COURT:  Here's Schedule J.  Installment

14    payments, detailed expense attachment.  Is it in there?

15         MR. SMALARZ:  Let's take a look.

16         THE COURT:  This is utilities, other installment

17    payments.  Is it in here?

18         MR. SMALARZ:  I do not see it, your Honor.

19         THE COURT:  How much are the Mercedes?

20         MR. SMALARZ:  Off the top of my head, I do not know.

21    I believe those are paid for by the business because they are

22    leased by the business.

23         THE COURT:  What other personal expenses besides the

24    Mercedes and the payment to the relative does the business

25    pay?

1    MR. SMALARZ:  Well, your Honor, again, I think it

2    varies on a month-to-month basis.  I believe it just depends.

3    In some months some expenses are paid.  Other expenses are

4    not paid.  It's impossible to tack down exactly --

5    THE COURT:  They pay the Mercedes every month.

6    MR. SMALARZ:  Yes, sir.  Your Honor, if I may

7    continue, courts who have -- that have looked at this 707(a)

8    issue have consistently held that a dismissal under 707(a)

9    can only be utilized in the most egregious cases, cases where

10   there is an intention to avoid a large single creditor based

11   on conduct akin to fraud, misconduct, or gross negligence.

12   That has not been alleged in this case, your Honor.  The case

13   I'm specifically referring to is In re. Mohr.  It's a

14   Bankruptcy Court decision from the Southern District of Ohio

15   that was decided this year, and in Mohr the Court also held

16   that a debtor's ability to pay is not a primary consideration

17   under 707(a) and that a debtor's post-petition ability to

18   repay alone also does not support the dismissal without more

19   misconduct than just alleged ability to repay.

20   The case that's heavily relied on by Pacifica and

21   Mr. Bartley is the case of In re. Zick, a Sixth Circuit case

22   which is -- I would like the Court to note is a pre-BAPCPA

23   case.  And in the Zick case, the debtor's conduct was

24   egregious.  In that case, the debtor stole clients from his

25   former employer, intentionally violated a non-competition

1   agreement -- or noncompete agreement to his employer's

2   detriment, and then filed bankruptcy on the eve of a

3   mediation award against him by -- you know, in favor of his

4   former employer.  In that case, the Court found that there

5   was bad faith based on four factors, one being the debtor's

6   manipulation in reducing that creditor -- or his creditors to

7   one, the debtor's failure to change lifestyle or attempt any

8   efforts to repay, and I would like to emphasize "any efforts

9   to repay."  The petition in that case was clearly filed as a

10  response to this mediation award that was pending and

11  unfairness -- and the just overall unfairness of the debtor's

12  use of Chapter 7.

13          THE COURT:  Let's pause there for just a second --

14          MR. SMALARZ:  Yes.

15          THE COURT:  -- and stand by.  The motions here were

16  filed by Bartley and Pacifica.  Pacifica has a judgment;

17  right?

18          MR. SMALARZ:  Yes.

19          THE COURT:  When was that judgment entered?

20          MR. SMALARZ:  I believe the judgment was entered

21  early this year.

22          THE COURT:  Have the debtors paid anything on that

23  judgment?

24          MR. SMALARZ:  Not to my knowledge, your Honor.

25  There may have been some garnishments, but we're unclear

1    about that.

2              THE COURT:  Nothing voluntarily?

3              MR. SMALARZ:  Not to my knowledge.

4              THE COURT:  Does Bartley have a judgment?

5              MR. GRANT:  Yes, your Honor, January of this year in

6    Florida, 329,000.  Nothing has been paid on it.

7              THE COURT:  Do you agree with that?

8              MR. SMALARZ:  I have no reason to dispute it.  Your

9    Honor, really, again, the factors in _Zick_ that the Court used

10   to determine that the case was filed in bad faith simply

11   don't exist here.  Pacifica alleges in their motion that

12   Mr. -- or the debtors wound their creditors down to one

13   essentially or one major creditor prior to filing, and while

14   there is no dispute that the obligation owed to Pacifica is a

15   substantial portion of the total debt owed by the debtors,

16   they are not the only creditor as evidenced by Mr. Bartley's

17   counsel being here today.

18             THE COURT:  Can you explain to me why a Chapter 11

19   wasn't filed here?

20             MR. SMALARZ:  Well, your Honor, I can't speak for

21   that, but I believe that it was just the debtors were not in

22   a position to do a Chapter 11.  I think that was a little bit

23   beyond their means.

24             THE COURT:  Suppose for a moment they lived in a

25   two-bedroom apartment, maybe three, $1,500 a month.  Their

1   food budget was more like your average Chapter 7 debtor's

2   food budget, $600 a month.  Assume their total expenses

3   including taxes were -- I don't know -- ten, $11,000 a month

4   and that, therefore, they had 15 or $20,000 a month of net

5   disposable income.  How much could they pay their creditors

6   in a five-year Chapter 11 plan then?

7            MR. SMALARZ:  Well, your Honor, that could be an

8   interesting issue to look into; however, simply because of

9   the fact that these are not the average debtors does not make

10  it so that they should not be afforded the right to file

11  bankruptcy and get a Chapter 7 discharge.  I believe --

12           THE COURT:  Why not?

13           MR. SMALARZ:  Well, your Honor, I believe that

14  there's case law that supports that position.  Specifically I

15  cited in my brief a case called In re. Perlin.  It's a post-

16  BAPCPA case out of the Third Circuit.  The facts in that case

17  are very similar to the facts in this case in the sense that

18  in Perlin the debtor was a doctor.  He was a radiologist

19  making about $370,000 a year.  His wife was a business owner

20  and had substantial income.  The debtor and his wife owned

21  two Lexus automobiles.  Those debtors had private school

22  tuition of $5,000 a month for each one of their children and

23  had $430,000 in retirement funds saved.  In that case, the

24  debtor and his wife personally guaranteed some medical

25  equipment for the wife's medical practice.  Payments were --

1    there was default in the payments.  They pursued the

2    deficiency, et cetera, et cetera.  In that case, the Third --

3    ultimately the Third Circuit held that the case under those

4    circumstances was not an abuse of 707 -- or not an abuse

5    under 707(a).  The Court did note that, you know, the debtors

6    were straightforward and forthcoming in their schedules even

7    though they had higher than average expenses.  So in that

8    case, they weren't the average debtors, but they weren't

9    discriminated against because they weren't the average

10   debtors.  The _Perlin_ court did a very, very wonderful job, in

11   my opinion, of looking --

12          THE COURT:  Where's the belt-tightening in this

13   case?  I'm sorry.  I want you to continue with that.  What

14   did _Perlin_ say on this issue?

15          MR. SMALARZ:  Well, your Honor, _Perlin_ really took a

16   long look at the legislative history under Section 707 and

17   really pointed out how Congress did not intend for a debtor's

18   ability to pay, future ability to pay, or their income and

19   expenses to be a factor in determining bad faith absent any

20   additional misconduct.  I believe that's exactly what we have

21   here.  Yes, the debtors are not your average debtors.  Yes,

22   they have higher than average income.

23          THE COURT:  So if they made a million dollars a

24   month and spent it, they get Chapter 7?

25          MR. SMALARZ:  Absent any other misconduct, your

1  Honor, I don't --

2        THE COURT: Ten million dollars a month?

3        MR. SMALARZ: Well, we could sit here and say a

4  hundred million dollars a month, your Honor. I just --

5        THE COURT: That's where I was going next.

6        MR. SMALARZ: Yes. Well, we could sit here all day,

7  and if they were making a hundred million dollars a month, I

8  don't believe they would need to file Chapter 7, but that's

9  simply not the case.

10        THE COURT: Well, but if they spent it, you'd say

11  yes, wouldn't you?

12        MR. SMALARZ: I can't say what if. Those are

13  assuming facts that aren't in play, so I can't --

14        THE COURT: Well, but the question that's raised is

15  where is the line. There has to be a line somewhere.

16        MR. SMALARZ: There has to be a line, your Honor.

17        THE COURT: Where is it?

18        MR. SMALARZ: And I believe that line is when you

19  have -- you have to -- it's a little bit of a moving target.

20  I know that kind of doesn't --

21        THE COURT: Where is the line?

22        MR. SMALARZ: There is no line, your Honor. We have

23  to look at the misconduct.

24        THE COURT: No line. A hundred million dollars.

25        MR. SMALARZ: There is no line, your Honor. You

1  have to look to see if the debtors have any misconduct.

2  THE COURT:  A billion dollars a month.  If they

3  spend it --

4  MR. SMALARZ:  I would love to meet --

5  THE COURT:  -- they get a Chapter 7.

6  MR. SMALARZ:  I would love to meet a Chapter 7

7  debtor with a billion dollars of income.  It would be

8  wonderful.  But I think that's the main issue, your Honor.  I

9  think what we have to look at are the debtors' sincerity of

10  intentions.  I think that that is the absolute key in this

11  case.  That is what all of these cases -- <u>Zick</u>, <u>Perlin</u>, and

12  other cases that were cited in the brief all kind of had that

13  similar theme.

14  THE COURT:  Where is the belt-tightening that proves

15  their sincerity of intention?

16  MR. SMALARZ:  Well, your Honor, there are -- there

17  is some -- a number of circumstances where there was belt-

18  tightening.  Creditor's counsel indicates that the debtors

19  are reaffirming all these secured obligations.  I reviewed

20  the docket.  There was one reaffirmation agreement filed,

21  which was subsequently rescinded.  There have been no other

22  reaffirmation agreements filed.  The debtors -- all of their

23  real estate is worth significantly less than what they owe on

24  those obligations.

25  THE COURT:  Where is the belt-tightening?

1          MR. SMALARZ:  Well, your Honor --

2          THE COURT:  Where have they reduced expenses to show

3     an honest intention to try to pay their creditors?

4          MR. SMALARZ:  Your Honor, the debtors have at least

5     informed me that they stay in.  They do not go out like they

6     supposedly used to go out.  They do not own fancy items.  The

7     furniture in their house is old.  It's used.  It's not top of

8     the line things.  The automobiles are either leased by the

9     businesses or purchased by the businesses.  This business of

10    a $30,000 down-payment was actually not from the debtors.  It

11    was from a business owned by the debtors.

12         THE COURT:  Right, but it's all flow-through money.

13    Every dollar that the business spends on a Mercedes is one

14    less dollar they have available to pay their creditors.

15         MR. SMALARZ:  Well, the debtors have also -- like I

16    said, your Honor, that's --

17         THE COURT:  Am I right about that?

18         MR. SMALARZ:  Yes and no, your Honor.  As I

19    mentioned earlier, the accounts -- there's an accounts

20    receivable, accounts payable account where the debtors -- if

21    the business is running short, in the past the debtors have,

22    you know, given money to the business to help keep that

23    going, and the business is --

24         THE COURT:  Where do they get money to put money

25    back into the business?

1    MR. SMALARZ:  Well, your Honor, the debtors have had

2    other businesses.  They own a rental house.  There's other

3    things going on in the case at least in the past.  I can't

4    speak for what's going on right now because I think things

5    have changed a little bit just in light of the economy, but I

6    believe that is -- that is the main -- or the main point is

7    the debtors' sincerity of intentions.

8    THE COURT:  And all I heard you in terms of belt-

9    tightening was they don't go out to eat as much.

10   MR. SMALARZ:  Well, your Honor, they really don't --

11   my clients, they don't take these alleged vacations that

12   are -- all these purported vacations to Florida and Jordan.

13   Well, I'm here to tell you that the trip to Jordan was for a

14   funeral.  My clients have a number -- they're from Iraq.

15   They have a number of relatives who are Iraqi refugees who

16   fled to Jordan.  One of their relatives died, and they needed

17   to go to the funeral.  That certainly was not a pleasure

18   trip.  To the best of my knowledge, the debtors are no

19   longer -- or have not taken any other vacations.  They

20   haven't been to Florida in awhile.  So I think those are

21   definite examples.

22   THE COURT:  Why $1,500 a month for food?

23   MR. SMALARZ:  Well, your Honor, food is expensive.

24   Family of four, that's about $400 -- a little less than $400

25   a month per person.  I mean that's not outrageous, so, you

1   know, there are -- the debtors are not living the extravagant
2   lifestyle of the rich and famous that the creditors would
3   have the Court believe, and for those reasons, we believe
4   that this case was filed --
5           THE COURT:  Why private school?
6           MR. SMALARZ:  Well, your Honor, that's a great
7   point.
8           THE COURT:  It's not a point.  It's a question.
9           MR. SMALARZ:  Thank you.  It's a good question.
10  Private school.  I mentioned in my brief the Cleary case.
11  Now, while the Cleary case -- the debtors in that case, that
12  private school tuition was not as expensive as the private
13  school tuition in this case, the overall percentage, your
14  Honor, in the Cleary case --
15          THE COURT:  Right, but why do the debtors need
16  private school for their kids?  That's not going to be found
17  in a case.
18          MR. SMALARZ:  Right.
19          THE COURT:  That's going to be found from the
20  debtors.  Why private school for the kids?
21          MR. SMALARZ:  Well, your Honor, I believe that --
22          THE COURT:  Bloomfield Hills isn't good enough?
23          MR. SMALARZ:  I didn't attend Bloomfield schools,
24  your Honor.  I have no idea what kind of -- how good those
25  schools are.

1        THE COURT: I'm not asking you your opinion. I'm

2  asking you the debtors' opinion of why private school.

3        MR. SMALARZ: I believe the debtors have always sent

4  their children to private school, and I believe that that has

5  just become a custom, and they've just always followed

6  through with that.

7        THE COURT: Of course, if that was an allowed

8  excuse, we wouldn't talk about belt-tightening at all. Belt-

9  tightening means we don't do things the way we always did.

10       MR. SMALARZ: Well, your Honor, in the <u>Perlin</u> case

11  that I mentioned earlier, the fact that the debtors had a

12  $5,000-a-month tuition expense for their children, which is

13  actually higher than what we have here --

14       THE COURT: Does the Third Circuit have a different

15  view of belt-tightening than the Sixth Circuit?

16       MR. SMALARZ: They may.

17       THE COURT: Well, we're in the Sixth.

18       MR. SMALARZ: We are in the Sixth, your Honor, and,

19  again, I still believe that without any additional

20  misconduct, without any other egregious activity, that those

21  alone -- those expenses alone do not warrant a finding of bad

22  faith. Your Honor, the evaluation of expenses was post-

23  BAPCPA specifically set forth in 707(b), which are consumer

24  debt cases. If Congress intended for the Court to look at a

25  debtor's expenses in a business debt case, that would not

1   have been a specific exclusion from 707(b).  It stands to

2   reason that that would have been left in.  So in this

3   particular situation, the debt in this case -- the bulk of

4   the debt in this case is clearly business debt.

5          THE COURT:  What's the standard for dismissal under

6   707(a)?

7          MR. SMALARZ:  Well, your Honor, in this Circuit it's

8   bad faith, and bad faith --

9          THE COURT:  No.  I mean under the statute, the

10  statutory standard.

11         MR. SMALARZ:  Your Honor, I don't have the statute

12  in front of me, but it just -- failure to pay fees, failure

13  to --

14         THE COURT:  It's cause; right?

15         MR. SMALARZ:  Yes, cause.  And cause is not

16  specifically defined in the statute.  There are --

17         THE COURT:  It's addressed to the Court's

18  discretion.

19         MR. SMALARZ:  Yes, exactly, your Honor.  And there

20  are 14 factors that were set forth in the brief and some

21  other cases.  Those cases, while instructive, are not binding

22  on this Court, but they are, you know --

23         THE COURT:  Zick is the binding case on 707(a)

24  dismissals; right?

25         MR. SMALARZ:  Yes, sir.  And Zick does not

1  specifically set out factors.  The factors that the <u>Zick</u>
2  court used to find bad faith simply don't exist in this case.
3  I think this case is certainly distinguishable from <u>Zick</u> in
4  that the debtor in <u>Zick</u> clearly acted in bad faith.  He
5  deliberately violated a noncompete clause.  This is a case of
6  debtors who -- yes, they're high-income debtors.  Yes,
7  they're doctors.  Yes, they're not the average Chapter 7
8  debtor, but they were, you know, for lack of a better term,
9  the victims of a horrible real estate market.  The debt that
10 is owed to Pacifica, again, was a deficiency judgment from a
11 failed commercial real estate deal in Florida that I don't
12 believe -- those circumstances alone, in my opinion, do not
13 give rise to bad faith and do not warrant dismissal under
14 707(a).
15         THE COURT:  Thank you, sir.
16         MR. SMALARZ:  Thank you.
17         THE COURT:  One second.  Ms. Clark, are you here
18 observing for your client, Mr. Shapiro?
19         MS. CLARK:  I'm observing, and I'd only like to
20 report to the Court the trustee's investigation has revealed
21 potential assets in the case of approximately a hundred
22 thousand dollars or more, and these assets will be available
23 to all creditors if the case remains in a Chapter 7.  To the
24 extent that it's dismissed, then only the creditors that have
25 judgments such as Pacifica will be able to collect from those

1   assets. Also, I'd like to point out that Pacifica does have
2   a 727 action pending, and if the allegations raised today are
3   accurate, it's a great possibility that they could prevail on
4   that 727. If they prevail on the 727, not only does Pacifica
5   get the results it wants by being able to pursue post-
6   petition assets, but also there's a pool of assets there
7   available for Chapter 7 -- or for the Chapter 7 creditors.
8         THE COURT: In Chapter 11 suppose there's -- I don't
9   know -- $1.5 million available over five years.
10         MS. CLARK: That's correct, your Honor, but there's
11   also a chance that the case would get dismissed and then
12   wait, and then when the case -- Chapter 7 gets dismissed, the
13   pool of assets that the trustee has discovered now will no
14   longer be available.
15         THE COURT: What are those assets?
16         MS. CLARK: Well, your Honor, there's the BMW.
17   There's a payment of -- a prepayment of the tuition for the
18   college -- or the -- I'm sorry -- prepayment of the tuition
19   for the school, the private school. There is 529 account
20   contributions made within the last year of approximately
21   $54,000 that are available to the Chapter 7 estate. There's
22   a couple of preferences made probably -- I think it was
23   around $30,000 in preferences, and there's -- it looks like
24   there's equity in the commercial property located on Dix Road
25   of about a hundred thousand dollars at this point.

1          THE COURT:  Thank you.  Oh, I do have another

2    question for you.  You do Chapter 7's; right?

3          MS. CLARK:  That's correct, your Honor.

4          THE COURT:  And your office does?

5          MS. CLARK:  Yes.

6          THE COURT:  In your experience -- and you've done

7    that for a long time?

8          MS. CLARK:  Yes.

9          THE COURT:  I won't ask you how long.  In your

10   experience, the average Chapter 7 debtor that you see spends

11   how much a month on food?

12         MS. CLARK:  On food?  $200 a person.

13         THE COURT:  Per month?

14         MS. CLARK:  Per month.

15         THE COURT:  Thank you.  Sir.

16         MR. SEABOLT:  Your Honor, very briefly, I think the

17   arguments have been adequately addressed by and large.  Just

18   a couple of points I'd like to make.  First of all, with

19   respect to the tuition issue -- and I'm glad brother counsel

20   brought it up -- it's $4,500 a month, $54,000 a year being

21   spent on tuition in one of the finest public school districts

22   in the state.  I don't think there's any question but that

23   this school district would be more than adequate for these

24   children.  And, again, as your Honor pointed out, what people

25   have become accustomed to is exactly what needs to change in

1   the context of a Chapter 7 bankruptcy.  That's what belt-
2   tightening is all about.  And in our fair city, even those of
3   us who aren't in Chapter 7 have to engage in extensive belt-
4   tightening these days, and there's no reason to allow these
5   debtors a free pass with this kind of --

6           THE COURT:  Counsel argues that the law doesn't
7   require belt-tightening if the debt is business as opposed to
8   consumer.

9           MR. SEABOLT:  Well, I disagree with that, and, first
10  of all, that's not what this was filed as.  This was filed as
11  a consumer case.  These are consumers.  And whether these are
12  business debts or consumer debts, some interesting statements
13  being made here on the record.  I don't know that the
14  evidence fully supports it, your Honor, but to suggest that
15  no belt-tightening is required I don't think is accurate, and
16  to suggest that no belt-tightening is required if there's no
17  evidence of other more egregious misconduct is also
18  inaccurate.  And here, your Honor, there is evidence of
19  misconduct, and we went through in detail these schedules and
20  what was missing from these schedules, what hadn't been
21  disclosed from these schedules, and how miraculously when the
22  debtors wanted to buy a luxury vehicle they were able to come
23  up with $30,000.  That doesn't sound like someone who is in
24  need of bankruptcy protection nor does it sound like someone
25  who only has $20 free and clear a month in disposable income.

1     With respect to these businesses, your Honor, I'd

2   also like to point out, again, going back to the disclosures,

3   I'm not sure where counsel gets the facts.  The facts are

4   that in these disclosures these businesses -- with the

5   exception of the Associated Physicians and the entity that

6   owns their rental property, these businesses are no longer

7   operating, and they ceased operating in 2009.  And according

8   to their disclosures, these business entities, even those

9   that are still operating, have a current value of zero,

10  current value of zero.  It boggles my mind that we would on

11  one hand be suggesting that they're getting money from these

12  business entities, some of which -- most of which are no

13  longer even operating, and on the other hand be claiming that

14  the -- claiming that these entities have zero value.  It

15  simply makes no sense, your Honor.  The disclosures that are

16  made in one schedule don't match the disclosures made in

17  another.  The disclosures made in the deposition don't match

18  the disclosures made in these schedules, and the bank

19  statements belie all of these disclosures, your Honor.  They

20  belie any suggestion that these debtors have $20 per month.

21  And also, for the record, according to their bank records,

22  your Honor, this notion that they draw money out just as they

23  wish isn't exactly accurate, though clearly they are treating

24  this business as their own personal piggy bank, but the bank

25  records actually disclose that every month they receive

1  $37,000 in distributions from this entity, and they received

2  that in January.  They received it in February.  They

3  received it in March.  They received it in April.  $37,000

4  every month, and yet it also disclosed that in December there

5  was over a hundred thousand dollar distribution made as well.

6  So, yeah, they're clearly dipping into it as their own

7  personal piggy bank, but the suggestion that there isn't

8  steady income here, it's false.  It's absolutely false.

9       THE COURT:  All right.  The Court concludes that to

10  resolve this issue, we need to conduct an evidentiary

11  hearing.  How about tomorrow morning at 9:30?  Any

12  objections?

13       MR. SMALARZ:  Your Honor, I think we need a little

14  bit more time to do some discovery before we have an

15  evidentiary hearing.

16       THE COURT:  Discovery of what?

17       MR. SMALARZ:  Well, your Honor, for example --

18       THE COURT:  Your clients have got all the facts.

19       MR. SMALARZ:  Well, your Honor --

20       THE COURT:  Your clients are the facts.

21       MR. SMALARZ:  Your Honor, Mr. Wienner in his reply

22  brief indicated that he has specific knowledge of

23  negotiations with himself and between Mr. Greenberg, the

24  debtor's state court counsel, about any payments.  We may

25  need to take his testimony.

1    THE COURT:  Tomorrow morning, 9:30.  Bring your

2  clients in.

3    MR. SMALARZ:  Thank you.

4    THE COURT:  Have them bring their business records,

5  too.

6    MR. SMALARZ:  Thank you, your Honor.

7    THE COURT:  We have to know how much these Mercedes

8  cost.

9    MR. SEABOLT:  Your Honor, just for clarity, when you

10  say "business records," we're referring to their ledgers and

11  financial statements with respect to the ongoing business

12  entities that these debtors have.  Is that accurate?

13    THE COURT:  No.  I'm thinking about their medical

14  practice --

15    MR. SEABOLT:  Okay.

16    THE COURT:  -- business records.

17    MR. SEABOLT:  Okay.

18    MR. GRANT:  Your Honor, may I also request that the

19  Court ask the debtors to bring in their retirement money

20  funds?  At some point in their response brief they mentioned

21  that three-quarters of their available money in whatever box

22  it's labeled is retirement funds, and there is a Sixth

23  Circuit case which said that the Michigan statute prohibiting

24  garnishment of so-called IRAs is preempted by federal law.

25  It's not followed very often.  But setting that aside, it's

1  clear that if you put in too much money into a so-called IRA,

2  it doesn't make it an IRA.  An IRA is simply a tax deferment

3  vehicle.  It's not a spendthrift trust.  I'd like the debtors

4  to bring in all records showing what they actually have in

5  retirement monies as well because since they own their own

6  business, as your Honor well knows, you can play with this

7  and stuff extra stuff in there.

8          THE COURT:  I think for now we'll just stick with

9  the medical practice business records.  9:30 tomorrow

10  morning.

11          MR. SEABOLT:  Thank you, your Honor.

12       (Proceedings concluded at 10:48 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                        November 29, 2010
_____          _____
Lois Garrett